Good morning, my name is Brent Rosenberg, and I am here representing the defendant in this case, Mr. Kathan Wiley. He was charged with conspiracy to distribute fentanyl from June 1, 2020 to through January 28, 2022. In a second count, he was charged with possession with intent to distribute fentanyl resulting in serious bodily injury on October 30, 2021. Mr. Wiley went to trial and was convicted on both counts. Thereafter, his trial counsel, who was, I was not his trial counsel, just to make sure that everybody knows that, was appointed merely for the appeal. Anyway, he raised the sufficiency of the evidence with regard to both counts via a Rule 29 motion. The court denied the motion and Mr. Wiley appealed. And today we're presenting three basic issues. And they are summarily described as whether Mr. Wiley voluntarily and intentionally entered into an agreement and conspiracy to distribute with a shared purpose. And the key is the shared purpose. And whether the fentanyl ingested by his son was specifically intended for distribution rather than for his personal use. And Mr. Wiley, of course, is a person who is addicted to the drug quite severely. And then the final issue is whether USSG 2D1.1B13, a sentencing enhancement relating to the distribution or misrepresentation in connection with the distribution, is appropriate in this case. Briefly backtrack a little bit and talk a little, mention a few key evidentiary points. As you probably know from reading the brief, Mr. Wiley's young son got into his fentanyl. He ate one pill, became ill, and was rushed to the hospital. Is it conceded it was just one pill? Pardon me? Is it conceded that it was just one pill? Well, the evidence specifically, the statements of Jessica Brady, quote Mr. Wiley as saying, he ate my pill. That's the only evidence on the number of pills? That is the evidence on the number of pills. I don't have any medical evidence indicating otherwise. I know of no other evidence on the point. Anyway, as I mentioned, Mr. Wiley was addicted to fentanyl. He also sold some fentanyl to support his addiction. Therefore, he possessed the fentanyl for two distinct purposes, one for distribution and one for personal use. That becomes very important in the analysis of count two. Counsel, on Judge Arnold's question, there was testimony about pills in a bag. Might it be more than one pill that the child ingested? Well, there was testimony about pills in a bag. There's no question he possessed more than one pill. The real question was, was that pill that was ingested by his son intended for his personal use as opposed to the pills that he would have had for distribution? And again, I can't cite enough Jessica Brady's statement that he referred to it as his pill. Let me see here just one second. With regard to the conspiracy count, we note primarily in our brief that there was basically a buy-sell relationship Mr. Wiley had with, well, at least one other conspirator. That would be the person who was providing him with the drugs. And then he sold it to other people. The purpose of Mr. Wiley's involvement in that, of course, was to sell enough of the drug to make the money to pay for the drugs that he intended to consume. He didn't have a broader purpose in mind. His purpose was to get high, pay for the drugs that he needed to get high. Well, the real evidence is yes and no, right? It doesn't, you said her name, is that Ms. Brady? Didn't she say yes or no, was he selling? Wasn't that her name? She said yes or no, but in the context of her testimony. I think she said yes and no, didn't she? She said yes or no. It doesn't matter. But address the point that the best evidence for him was that he probably was, right, if you say yes or no? Or yes and no? I'm not following the question, I'm sorry. Well, do you know what Ms. Brady really said? Let's start with the fact of the matter. Well, I can find it for you. But if it's not handy, don't worry about it. But I thought she said yes or no. Was he selling the pills and all that? Well, he was selling the pills. I don't think there's any question that he was distributing them. Do you know the question to her? I'm sorry. Do you know the question to her so we just don't wander around? It's in the briefs. Don't be concerned. I did have it in my brief. I'm not sure exactly where. No, it's in the briefs. Proceed with your argument. But in any event, we concede the point that he was selling. That's not an issue. He was definitely doing that. That's, you know, we're not looking for a reversal or asking this court to reverse the finding with regard to intent to distribute. We are, of course, asking this court to reverse the finding with regard to There was plenty of evidence. It wasn't a mere buyer-seller relationship. There was an ongoing conspiracy to buy and sell through particular sources. Isn't that right? There was more evidence of a considerable amount of drug transactions. Ms. Brady describes having seen Mr. Wiley with not really a very large quantity, and he never seemed to have any money. I thought he had 100. I thought her number was 100. No, 100 watts is what she said. But otherwise, she would see him with relatively small quantities. And she also mentions that he was doing maybe five pills a day, I believe. What about the Facebook messages? Are you referring to where he's communicating with? Yes, sure. Perks, perks for sale. Yes, I've got perks for sale. I've got Zans, all kinds of stuff. But again, we're not disputing the fact that he was distributing. But with regard to the conspiracy count, what we're saying is he didn't share a broader purpose, which the courts refer to. What is the purpose that was lacking in your mind? Because certainly he had a purpose to distribute, right? And he was obtaining these from another person who obviously, I would guess, had the purpose of selling drugs as well. What are we missing there? Again, let me just go back to Conway, which is the key case on this point. And the court noted there that a reasonable jury can find that a defendant has more than a mere buyer-seller relationship if the evidence supports the finding that they shared a conspiratorial purpose to advance other transfers. Other transfers. Wouldn't that be your client's sales? Well, I don't read it that way. I read it as indicating that a buyer-seller relationship, I mean, pretty much they say if it's just one buy-one-sell, that's not enough to be in the conspiracy. Well, why is 10 buy-sell transactions enough to be in the conspiracy if you don't share a broader purpose, which he did not? His purpose was simply to make enough money to get high. What about the simple use of the word flip the pills? Well, again, we're not arguing that he didn't intend to sell. Is there evidence about what the term flip meant? I thought flip implies you get them from one place, you get them to another place. Go ahead. Well, my understanding of flipping is basically the same thing as selling. Okay. But is there anything in the record about what flip meant? No. Because it is in the testimony, right? Not that I'm aware of. There's a lot of those messages I would say that lack context, and I'll get into one of those in particular in a bit. Let me go on to count two, if I could. And again, this is possession with intent to distribute causing serious bodily injury. The fundamental point is, as I said, the evidence is clear that drugs were possessed for two purposes, and these are distinct purposes. One is for personal consumption, and there's the testimony of Jessica Brady on that. And two is for sale at a profit to cover the cost of purpose number one. These purposes are actually mutually exclusive, because with regard to any specific dose of drug, Wiley is either going to consume the drug himself or distribute it to someone else who will consume the drug. So if you sell it to somebody, you're not going to consume that drug. If you don't sell it to somebody, you're going to consume that drug. And if your purpose in selling is to make enough money to pay for the drugs that you consume, you've got two purposes going there in connection with count two. And again, it's not disputed that the government has met its burden to prove purpose number one, which would be intent to distribute. But it is disputed that the government has met its burden to prove purpose one with regard to at least some of the drugs. Counsel, so you know, you're now in your rebuttal. You can use it now or reserve it or any part of it, of course, as you go.  I'll try to be as quick as I can, but I do want to finish this point at least.  The instruction that was given requires proof beyond a reasonable doubt that the specific drug consumed by Baby K, which was his son, was intended for distribution. And I'll direct you back to the his pill reference. And we would say that it's possible that it was so possessed. It's possible. It may even be likely. But since the two purposes are mutually exclusive, the government's proof is merely speculation on that point. And there's no way that speculation has proven the required link to purpose number two by any legal standard, let alone beyond a reasonable doubt. It's just a guess at this point as to what he was going to do with that pill. The enhanced penalty provision, as I'm sure you know, has huge consequences. I did a little calculating on that myself. I would note to you that, of course, in addition to the statutory differences, which are enormous, we calculated that instead of a guideline sentencing range of 29 to 365 months, without the bodily injury enhancement, the guideline range would likely be 27 to 33 months. And with that, I will reserve the final 50 seconds, unless you have a question. Yes, and we'll round it to one minute for you. Okay. So you can prepare. Thank you. And thank you for the argument. Ms. Glasgow. Please proceed. Thank you, Your Honor. May it please the court. My name is Andrea Glasgow. I represent the United States in this matter, and I was also trial counsel in this matter. I'll start with some of the questions of the court. Initially, what was the evidence related to whether there was a single pill or multiple pills? Ms. Brady testified that Mr. Wiley told her a couple of different things. The testimony was that at one point Mr. Wiley told her that the child got into a pill, singular, and that was clarified. There were also times that Mr. Wiley stated the baby got into multiple pills and used the plural. That evidence was that he made different statements at different times. What we had also was a recorded statement, a message that Mr. Wiley sent to Belinda Buford. That was from the Facebook messages wherein Mr. Wiley stated the child got into his pills, plural. The other evidence was that Mr. Wiley had told Jessica Brady that he obtained a golf ball-sized amount of pills that morning, what was described in messages as being 100 pills that morning. So the evidence was that there were multiple pills. The evidence on how many the baby ingested is a bit unknown. It's unknown if the baby got multiple pills or a single pill. It may not be relevant, but it was a fact I wanted to know. Right. And so the evidence is that Mr. Wiley, on the day of the child's overdose, possessed a golf ball-sized amount of pills, which was described as 100 pills, which he had obtained for distribution. The text messages discussed FLIP. FLIP was described. Ms. Brady was the participant in those messages with Mr. Wiley wherein he said he was obtaining the pills to flip them. Ms. Brady testified that she understood that to mean he was going to sell them, and he explained that. That was part of the messages. That's how I'm going to get the money. They were arguing back and forth about him using so much money to buy 100 pills, and he said, I've got to flip them. That's how I'm going to get the money. Additionally, Special Agent Thomas Smith testified as the drug expert. He testified both in his experience that he testified to some slang terms, just common text slang, and to drug slang. There were charts admitted as Governments Exhibits 8 and 9, which lay out different slang phrases that were parts of these text messages so that the jury could have assistance in reviewing and understanding what different slang phrases meant, both specific to the drug context and general slang words that are found in text messages. As to the purpose of the conspiracy, it's clear that Mr. Wiley's purpose and the purpose of the conspiracy was to distribute fentanyl. There doesn't need to be a higher purpose to make money, to be successful in making money. As this Court is aware, the conspiracy doesn't have to result in success. Even if the course of the conspiracy's goal was to make money, Mr. Wiley's argument was that he wasn't successful in making money. He doesn't have to be successful in making money, nor does that have to be the purpose of the conspiracy. The purpose of the conspiracy clearly was to distribute fentanyl. There was messages that Mr. Wiley was obtaining these fentanyl pills to redistribute them. As Conway says, which was cited too, evidence is sufficient to support a conspiracy where drugs were purchased for resale. That's clearly what Mr. Wiley was doing here. There are text messages both before and after the child's overdose, indicating that he's trying to sell these pills. The buyer-seller defense usually works only in the context of when the buyer's just going to consume the pills himself or herself. Isn't that right? Correct. It's a very narrow notion. Correct, and it's typically limited to a single occurrence. In this case, Jessica Brady also testified that Mr. Wiley had been distributing these pills since July. The child overdosed in October. It was clear that this was an ongoing distribution cycle. Was there any evidence that this golf ball bag was purchased for any other purpose than flipping? No. Was he not a user himself? He was a user, yes. Why should we assume that this could have been also a source for his own consumption? Well, we don't have to assume. We have Mr. Wiley's own words of his purpose. He said he was purchasing the pills to flip them. Those were his words. That's part of his text message with Jessica Brady. So on the basis of that, the jury could find beyond a reasonable doubt that one of these pills intended for flipping was the pill that the little boy took. Is that correct? Is that what you're saying? Well, there was additional evidence as well. Not only was that his communication with Mr. Brady, but Mr. Wiley also had text messages advertising the pills for sale. All of them? I mean in a 100-pill volume or just individually?  He said things such as perks for sale, perks on deck.  There was no conversation about 100 pills being for sale. But that was occurring both in the days before he obtained the 100. There's no question. I don't think there's any question that he possessed these for sale or that he bought these for sale. I'm a little bit concerned here because there's evidence that he was a user. Everyone assumes that he was. So what I'm looking at is why should I hold it that the jury could find beyond a reasonable doubt that the pills that this little fellow consumed were what caused his death? Well, I think it's important to keep in mind the standard of review. Right? It is whether any interpretation of the evidence allowed a reasonable jury to convict. That's what I asked. And in this case, there was evidence from Mr. Wiley's statements of what he intended to do with the pills, which was flip them. He then had statements selling and advertising the pills for sale. And the jury had before it evidence of his use, which they were able to weigh in their assessment of their evidence. But, you know, the inference has to be strong enough to carry the day with a burden of proof which is beyond a reasonable doubt. So I agree that there might be some inference that could be drawn from the fact that these pills were purchased, at least in the beginning, for purposes of resale. But is that inference strong enough to support a verdict beyond a reasonable doubt that one of those pills that was intended for sale was the one that killed this little fellow? It's the strength of the inference that I'm worried about. Well, Your Honor, I think the thing that is important to remember is the idea that the child overdosed on one single pill was purely brought in by argument. Okay, pills. Yeah, I'll give you two or three pills. So what about, I mean, you know, then you've got a real causation problem because there might have been one in there that was intended for sale and one that wasn't. Which one killed him? I don't think that helps you in this case. Well, I think it's important to keep in mind that the defendant possessed the pills with the intent to distribute them. That's indisputed. Now, for the idea that because there has to be one specific pill that's put on, there was no evidence whatsoever that the defendant possessed these specific pills with the intent to use them. It was a user. There was also no evidence whatsoever that the defendant was in any way setting aside a pill for use, and that's what the baby died into. I agree with that. We don't know that every once in a while he wouldn't pick a pill out of his bag and take it. But what we know is that the defendant obtained these pills with the purpose of distributing them. Okay, I think I read all the facts. After the child overdosed, within the days following the child's overdose, the defendant is continuing to advertise that his pills are for sale, and then about 10 days later he gets a message from the source of supply asking when they're going to have his money. They need the money. I don't question any of that. I understand that. Let me ask you, do I remember that it was just a day before that he'd gotten the bag of pills, and this is the bag that the child apparently got the pill from? The day before is when he text messages Ms. Brady and says he's going to obtain the pills. The testimony at trial from Ms. Brady was that he actually told her that he obtained the pills that morning. There had been a text message exchange on the 29th with Ms. Brady telling her that he intended to obtain the pills. He then went to his brother's house that night, came home the next morning with the child, and he told Ms. Brady, Ms. Brady's testimony was that Mr. Wiley told her that morning, the same day, that he had obtained these 100 pills, and the child overdosed in the afternoon of that same day. Okay, so how many hours do you estimate between the time that you, the reasonable jury could say, well, they got them then, and the child got the pill. How many hours? A reasonable jury. Your Honor, I believe that it would be a very short amount of time. Belinda Buford is Mr. Wiley's brother's girlfriend. She testified that she had dropped off Mr. Wiley and the child at the house and had not even made it out of Davenport before she got the call that the child had overdosed. So the defendant had, Mr. Wiley had only been at home for a matter of 20 minutes before she gets a call that the child is having this medical emergency. So it's not even hours since he had been home that he obtained these pills. Your Honor, the evidence is clear that Mr. Wiley had voluntarily and intentionally joined in this conspiracy, that he shared a purpose of the conspiracy with the other members. The evidence is also clear, and a reasonable jury could find, taking the light and the evidence most favorable to the government and accepting reasonable inferences, that the pills that Mr. Wiley possessed and that the child overdosed on were possessed with the intent to distribute them. As to the sentencing enhancement, the court made clear the ruling of its founding that Mr. Wiley knew that these pills contained fentanyl and that he was continually advertising them as Perc 30s, a clear reference to Percocet 30 milligrams. He was advertising these in conjunction with other legitimate prescription pills such as Xanax and Vicodin. And when asked specifically whether one of the pills was laced by one of his customers, Mr. Wiley claimed he didn't know. The court found that that was not true and that Mr. Wiley knew that these pills contained fentanyl and that he was knowingly misrepresenting them to his customers. Given all of that and Mr. Wiley's obstructive conduct, his below-guideline sentence is substantively reasonable. If there are no further questions, I will yield my time. You may. Thank you for the argument. Mr. Rosenberg. I'd like to just start where the government left off. And mention the enhancement because I didn't get a chance to do that. I'm sorry, counsel, could you speak up just a little bit? Take the mic a little closer. I didn't get a chance to discuss the enhancement. But again, the main point we were making in the brief is that reference to Perc 30 was well known as a trade name. And nobody was fooled by that. And so he was not. By using a trade name is like using a nickname for somebody like Michael, calling him Mickey. Everybody knows when you say Mickey, you're talking about Michael. When you say Perc 30, everybody knows you're talking about something which is a mixture. And if you look at Thomas's testimony, he'll tell you that the mixtures were all, you never saw the same thing in two different bills. Thank you, counsel, for the argument. Case number 23-3342 is submitted for decision by the court. Ms. Grupe, please call the next case for me.